

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

*Barbara J. Houser*

**United States Bankruptcy Judge**

**Signed December 13, 2011**

---

**THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 11-31005-13 |
| MICHAEL DAVID CARROLL, | § | (Chapter 13) |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| ANJUM A. FAROOQI, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 11-03321 |
| | § | |
| MICHAEL DAVID CARROLL, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

The Court tried this adversary proceeding (the "Adversary") on November 7–8, 2011.

Plaintiff, Anjum A. Farooqi ("Farooqi"), is an individual residing in Irving, Texas, who moved

to Texas from New York City with the hope of purchasing a Salad Bowl Cafe.  Defendant,

Michael David Carroll ("Carroll"), is an individual residing in Irving, Texas, who filed for relief

under chapter 13 of the Bankruptcy Code on February 14, 2011.  At the relevant times, Carroll was chairman, chief executive officer, president and chief financial officer of the Salad Bowl Franchise Corporation and an owner and officer of its parent company, The Salad Bowl, Inc.  In the Adversary, Farooqi seeks to (i) liquidate his claims against Carroll, and (ii) have his claims determined to be nondischargeable in Carroll's bankruptcy case.

An issue arose at trial which had not been briefed by the parties.  Thus, post-trial briefs were required, the last of which was submitted on November 23, 2011, after which the Court took the Adversary under advisement.  For the reasons explained more fully below, the Court has authority to hear and determine the claims asserted in the Adversary pursuant to 28 U.S.C. §§ 1334 and 157(b).  *See infra* at pp.15–22.  The Court may enter a final judgment and a monetary judgment in the Adversary.  *Morrison v. W. Builders of Amarillo (In re Morrison)*, 555 F.3d 473, 479–80 (5th Cir. 2009).  This Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7051 and 9014.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Initial Meeting and Negotiations

At some point prior to the summer of 2009, Farooqi began to tire of life in New York City and of his job in the food service division of a local hospital.  Farooqi visited his sister in Dallas in the late summer of 2009 in order to look for a new career opportunity.  Ideally, Farooqi wanted to purchase a restaurant given his background in food service.[1]  While here, Farooqi contacted a business broker named Peggy Miller ("Miller") about purchasing a restaurant

---

[1] Audio Recording: Trial of *Farooqi v. Carroll*, held in the Bankruptcy Court for the Northern District of Texas (Nov. 7–8, 2011); Testimony of Farooqi, Nov. 7, 2011 at 9:31 a.m. (on file with the Bankruptcy Court) (hereinafter "Trial Record").

franchise or some other existing restaurant. [2]    Farooqi also contacted a loan broker named Ana Marshall ("Marshall"), who was to assist him with obtaining financing for any restaurant that he might choose to purchase.  Miller introduced Farooqi to Carroll, who, as noted previously, was the chairman, chief executive officer, president, and chief financial officer of the Salad Bowl Franchise Corporation ("Franchise Corporation"), a wholly-owned subsidiary[3] of The Salad Bowl, Inc. ("Inc.") (Franchise Corporation and Inc. will be collectively referred to herein as the "Salad Bowl Entities").[4]   Carroll had listed a Salad Bowl Café located at 4000 N. MacArthur, Suite 122, Irving, Texas as a franchise location that was for sale (the "Las Colinas Salad Bowl").

After being introduced by Miller, Farooqi and Carroll began to discuss the possibility of Farooqi purchasing the Las Colinas Salad Bowl.  On September 25, 2009, Carroll sent Farooqi a Franchise Disclosure Document, dated June 5, 2009, containing information about (i) Franchise Corporation, and (ii) Carroll's personal bankruptcy filing in 2006.[5]   *See* Defendant's Exhibit 2 (the "Franchise Disclosure Document").   The Franchise Disclosure Document contained no reference to any litigation against Carroll or the Salad Bowl Entities.   In fact, the Franchise Disclosure Document stated that there was no such litigation. *See* Defendant's Exhibit 2, p. 3.

---

[2] The trial testimony is unclear as to whether Farooqi made two trips to Dallas or just one before moving here early in 2010.  It is possible that Farooqi came to Dallas to visit his sister and look for opportunities, returned to New York and then returned to Dallas in September to look in earnest.  Alternatively, it is also possible that there was a single trip during which he visited his sister, made the decision that he wanted to move here if the right opportunity could be found and then began meeting with Miller, Marshall, and Carroll about the Las Colinas Salad Bowl.  Whether there was one trip or two is immaterial to the substance of the Court's decision and analysis.

[3] Carroll testified that the Franchise Corporation was a wholly-owned subsidiary of Inc.  However, based on the remainder of Carroll's testimony it is unclear whether Franchise Corporation was actually a wholly-owned subsidiary of Inc. or whether the two entities were simply closely related.  Again, this is immaterial to the substance of the Court's decision and analysis.

[4] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:31 a.m.

[5] Trial Record: Testimony of Marshall, Nov. 7, 2011 at 4:15–16 p.m.

On or about September 28, 2009, Farooqi attended a meeting with Carroll, Marshall and Leith Caddell ("Caddell"),[6] an employee of the Salad Bowl Entities to discuss the details of Farooqi's possible purchase of the Las Colinas Salad Bowl. Specifically, Farooqi wanted to know (i) what other assets would be sold to him in addition to the franchise itself, (ii) the types of training generally provided by the Salad Bowl Entities to its franchisees, and (iii) other details related to the purchase of the Las Colinas Salad Bowl.[7] Farooqi asked Marshall to attend the meeting with him because he considered Marshall to be his "right hand person" and was heavily reliant on Marshall to read and interpret any legal documents that might be required. Farooqi testified that he was relying on Marshall because he had no real experience in the negotiation of a business deal or with franchise documentation. In short, Farooqi admitted that he was very inexperienced and unsophisticated in these types of business transactions.[8] At that meeting a purchase price of $150,000 was agreed upon for the Las Colinas Salad Bowl.

The parties met again the following day to finalize their proposed transaction. At that time Farooqi was asked to sign a 30-day option to purchase agreement with Inc. (the "Option Agreement"). *See* Plaintiff's Exhibit 1.[9] However, Farooqi was concerned about the form of the

---

[6] There is some disagreement between the witnesses at trial as to whether Carroll was present in person for this meeting, or whether he was on a speaker-phone. There is also disagreement between the witnesses as to the exact date of the meeting. Again, this disagreement is not material to the Court's decision or analysis.

[7] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:37 a.m.

[8] *Id.* at 9:38–39 a.m.

[9] Inc. is defined in the Option Agreement as the "Owner." However, when Carroll executed the Option Agreement his signature block does not indicate that he was signing the document as an officer of Inc. It is fair to say that the Option Agreement is not artfully drafted, as neither party had a lawyer involved in preparing the documentation. Carroll apparently drafted the Option Agreement himself. However, the Court is satisfied when looking at the document as a whole and after considering the trial testimony that Carroll was acting as an officer of Inc. when he negotiated with Farooqi and when he signed the Option Agreement.

Option Agreement as proposed by Carroll and Inc.[10]  As a result of his concerns, the Option Agreement was amended to include what the parties called an option-out provision (the "Opt-Out Provision"), which would allow Farooqi to receive a return of his $25,000 if he could not obtain financing or if Inc. was unable to provide requested information, which information was needed for final approval of Farooqi's loan application.[11]  Farooqi, Caddell and Marshall all testified that the Opt-Out Provision was added to the Option Agreement in order to provide extra assurances to Farooqi, who was concerned about being able to obtain a $150,000 loan and close on his purchase of the Las Colinas Salad Bowl within the 30-day window otherwise provided in the Option Agreement.[12]  Farooqi and Carroll agreed that Farooqi would pay $25,000 at the time of the signing of the Option Agreement (as amended to include the Opt-Out Provision), which payment would represent the franchise fee for the Las Colinas Salad Bowl and would ultimately be applied towards the $150,000 purchase price for the Las Colinas Salad Bowl if Farooqi proceeded to close on his purchase of that restaurant.

Farooqi testified that he understood and considered the $25,000 to be part of the purchase price of the franchise itself, rather than a separate fee for the Option Agreement.[13]  Farooqi also testified that he understood the Option Agreement to limit Carroll's ability to sell the Las Colinas Salad Bowl to another party for at least 30 days while Farooqi secured his loan, rather than limiting Farooqi's ability to purchase the Las Colinas Salad Bowl.[14]

---

[10] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:44 a.m.; Testimony of Caddell, Nov. 7, 2011 at 3:17–18 p.m.

[11] Trial Record: Testimony of Carroll, Nov. 7, 2011 at 1:43–44 p.m.

[12] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:44 a.m.; Testimony of Caddell, Nov. 7, 2011 at 3:19 p.m.; Testimony of Marshall, Nov. 7, 2011 at 4:10 p.m., 4:13–14 p.m. and 5:18 p.m.

[13] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 10:25 a.m.

[14] *Id.* at 9:43–44 p.m.

## B. Execution of the Option Agreement and Post-Option Period Communications

According to Farooqi, Marshall and Caddell, after repeated assurances from Carroll that the 30-day period in the Option Agreement would not apply to the Opt-Out Provision and that Inc. would provide all financial information requested by Farooqi, Farooqi agreed to enter into the Option Agreement.[15] Farooqi and Carroll executed the Option Agreement (as amended to include the Opt-Out Provision) on September 30, 2009 at a Kinko's store near Carroll's office. After signing the Option Agreement, Farooqi handed Carroll a check for $2,500 instead of $25,000. The error was discovered and Farooqi wired $25,000 to Carroll a few days later.[16] Farooqi obtained these funds from his mother; he did not have $25,000 on his own with which to make this payment.

Marshall testified that (i) she had been researching financing options for Farooqi during September 2009; (ii) she encountered some difficulties obtaining a financing package, as Farooqi had only an average credit score; (iii) most commercial lenders structured their loan packages in far larger dollar amounts than Farooqi was interested in borrowing;[17] (iv) based upon her research, New England Commercial seemed like Farooqi's best financing option, (v) while

---

[15] *Id.* at 9:44–45 a.m.; Testimony of Marshall, Nov. 7, 2011 at 4:12–14 p.m. and 5:18 p.m.; Testimony of Caddell, Nov. 7, 2011 at 3:20 p.m.

[16] Farooqi testified that he wrote $2,500 on the first check. Carroll testified that Farooqi had correctly written $25,000 in the box on the check, but had written "twenty thousand" on the line, and so the bank would not accept the check. Irrespective of whose recollection is more accurate, both parties agree that once the mistake was discovered, Farooqi wired the correct sum from New York City. Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:46 a.m.; Testimony of Carroll, Nov. 8, 2011 at 11:49–50 a.m.

[17] Marshall testified that most loan packages were for amounts closer to $800,000. Farooqi was only interested in borrowing the minimum amount needed to purchase the Las Colinas Salad Bowl with a small amount left over for unexpected expenses, or around $150,000. Trial Record: Testimony of Marshall, Nov. 7, 2011 at 4:00–01 p.m. and 4:02–04 p.m.

Farooqi was "pre-approved" for a loan with New England Commercial in late September 2009, that "pre-approval" did not guarantee that Farooqi would receive final approval for a loan; (vi) final approval of Farooqi's loan with New England Commercial was still contingent on the provision of detailed financial information about the Salad Bowl Entities; and (vii) Farooqi paid a $4,500 fee to New England Commercial as a loan-processing fee.[18] According to Marshall's testimony, some of the information requested by New England Commercial was not usually requested by commercial lenders, but New England Commercial was requiring the information here because (i) the Salad Bowl Entities were a fairly new franchise operation, and (ii) Farooqi did not have previous experience running a franchise restaurant.[19]

Immediately after the Option Agreement was signed, Marshall began requesting information from Carroll in order to complete Farooqi's loan application with New England Commercial.[20]   Marshall testified that she repeatedly requested a variety of information from Carroll; information that was never provided despite Carroll's repeated assurances that he would provide any and all information requested.[21]   In fact, Farooqi testified that Carroll often complained to him about Marshall's requests and questioned why Carroll was being asked to provide the requested information.[22]   Finally, on October 30, 2009, the last day of the option

---

[18] Farooqi testified that he gave the money for the loan application to Marshall to pay to New England Commercial. However, Marshall testified that she never received any money from Farooqi to pay to New England Commercial. Rather, according to Marshall, Farooqi sent the money directly to New England Commercial. Again, this discrepancy is of no real consequence here as it is clear that the loan application fee was paid. Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:50 a.m.; Testimony of Marshall, Nov. 7, 2011 at 4:53–54 p.m.

[19] Specifically, Marshall testified that New England Commercial was interested in the Salad Bowl Entities and requested information regarding their operations and stability. According to Marshall, New England Commercial was more interested in the Salad Bowl Entities as franchisor than they were in Farooqi as proposed franchisee. Trial Record: Testimony of Marshall, Nov. 7, 2011 at 4:03–04 p.m.

[20] *Id.* at 4:20 p.m.

[21] *Id.* at 4:21–22 p.m.; 4:27–28 p.m.; 4:35 p.m. and 5:19 p.m.

[22] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:46–47 a.m.

---

period, Carroll sent Marshall another copy of the Franchise Disclosure Document, which Carroll had previously provided to Farooqi on September 25, 2009.[23] Despite Carroll's repeated assurances before the Option Agreement was signed that all requested information would be provided, no additional documents (or information) were provided to Farooqi or Marshall during the 30-day option period.

Farooqi testified that Carroll never informed him that the Option Agreement had expired or that Farooqi would no longer be allowed to opt-out of the Option Agreement and obtain a refund of his $25,000.[24] In fact, Farooqi and Carroll continued to discuss Farooqi's purchase of the Las Colinas Salad Bowl and Marshall continued to request information from Carroll to complete Farooqi's loan application. Farooqi testified that he did not attempt to exercise the Opt-Out Provision during the 30-day period stated in the Option Agreement because (i) he believed he could opt-out at any time (as Carroll had repeatedly told him prior to the signing of the Option Agreement) if his financing was not approved or if Inc. failed to provide requested information, and (ii) he still wanted to purchase the Las Colinas Salad Bowl if he could obtain financing.[25] Farooqi also testified that throughout November and December 2009 he still believed he would be purchasing the Las Colinas Salad Bowl upon final approval of his loan.[26]

In January 2010, Farooqi quit his job in New York City and prepared to move part of his family to Texas in anticipation of his purchase of the Las Colinas Salad Bowl.[27] Farooqi and

---

[23] Trial Record: Testimony of Marshall, Nov. 7, 2011 at 4:27–28 p.m.

[24] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:49–50 a.m.

[25] *Id.* at 9:50 a.m.

[26] *Id.*

[27] *Id.* at 9:51–52 a.m.

Carroll continued to discuss the purchase of the Las Colinas Salad Bowl, and Marshall continued to request financial information to submit to New England Commercial. On January 20, 2010, Carroll sent Marshall an amended Franchise Disclosure Document dated December 29, 2009, which disclosed, for the first time, a lawsuit filed against Carroll, among others, by Mike and Kim Hinshaw in state district court in Travis County, Texas (the "Hinshaw Lawsuit").[28] Defendant's Exhibit 3.

At trial, Carroll ultimately admitted that he only provided "some" of the information requested by Marshall in order to complete Farooqi's loan application.[29]

### C. Farooqi's Loan Application is Denied and the Relationship Sours

On or about February 1, 2010, while en route to Texas, Farooqi received a call from Marshall telling him that his loan had been denied by New England Commercial.[30] Marshall had just received the denial information from New England Commercial. Farooqi immediately informed Carroll that his loan had been denied. Farooqi testified that he was very upset about the denial of his loan.[31]

Notwithstanding the denial of his loan, Carroll and Farooqi continued to discuss a potential purchase of the Las Colinas Salad Bowl, although Farooqi testified that he was too discouraged to apply for another loan for such a purchase at that time.[32] Farooqi and Carroll also discussed other potential Salad Bowl locations that Farooqi could purchase, including a new

---

[28] The Hinshaw Lawsuit is discussed further *infra* at p. 46–47.

[29] Trial Record: Testimony of Carroll, Nov. 8, 2011 at 11:52 a.m.

[30] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:53 a.m.

[31] *Id.* at 9:53–55 a.m.

[32] *Id.* at 11:15 a.m.

location that could be built-out in the same building as the Salad Bowl Entities' corporate offices.[33] Farooqi, however, was only interested in the Las Colinas Salad Bowl and was not interested in entering into negotiations for other locations, particularly for a brand-new location.[34] Moreover, Farooqi testified that in late-February or early-March, 2010, Carroll offered to seller-finance Farooqi's purchase of another Salad Bowl Café.[35] Again, Farooqi indicated that he was not interested in purchasing a different Salad Bowl Café.[36]

Sometime after Farooqi informed Carroll that his loan application had been denied, Carroll told Farooqi that the 30-day option period had expired and a refund of the $25,000 franchise fee was no longer available.[37] Farooqi was taken aback by this information because it was inconsistent with what he had been told by Carroll prior to the signing of the Option Agreement.[38] Farooqi testified that Carroll later recanted and said that the money was in an escrow account and that he and Farooqi could discuss a refund.[39]

In late February or early March 2010, Farooqi asked Carroll to refund his $25,000 franchise fee. Carroll initially testified at trial that he refused to return Farooqi's money because

---

[33] *Id.* at 9:57 a.m.

[34] *Id.* at 9:58 a.m.

[35] It is unclear from the evidence presented at trial if the Salad Bowl Entities had the capital necessary to provide seller-financing for Farooqi's purchase of another location. Trial Record: Testimony of Caddell, Nov. 7, 2011 at 2:50–53 p.m. and 2:58–59 p.m.

[36] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:58–59.

[37] *Id.* at 9:56 a.m.

[38] *Id.* at 9:56 a.m.

[39] *Id.* at 9:57 a.m. Caddell testified that Carroll had told other potential franchisees that their franchise fees would be placed in an escrow account, despite the fact that no escrow account existed and the money was deposited directly into the operating accounts of Franchise Corporation and/or Inc. Trial Record: Testimony of Caddell, Nov. 7, 2011 at 2:54–56 p.m. Specifically, Caddell testified that Carroll had made similar representations to Tim Grosse and Joe Leszko, who each encountered significant difficulties in obtaining refunds of their franchise fees from Carroll when they elected not to go forward with their respective transactions. *Id.* at 3:06–08 p.m. and 3:09–11 p.m.

---

he needed to discuss returning the fee with counsel for the Salad Bowl Entities.[40] The next day Carroll revised his testimony, however, stating that he had been willing to return Farooqi's money if Farooqi appeared in person at the Salad Bowl Entities' offices to sign non-compete and non-disclosure agreements.[41] Carroll was unable to credibly explain why Farooqi needed to come to the Salad Bowl Entities' offices in person to sign these documents instead of Carroll simply sending the documents to Farooqi for execution and return. Carroll testified that he wanted the non-compete and non-disclosure documents signed because of the length of time the negotiations with Farooqi had run, the amount of corporate information that had been disclosed to Farooqi and Marshall, and the fact that a friend of Farooqi's, Ali Choudhry, had worked at the Las Colinas Salad Bowl for several months and had been privy to confidential information while there.[42]

In contrast, Farooqi testified that he was never told by Carroll that if he signed some documents he could get his money back. Moreover, Farooqi testified that he would have been happy to sign whatever Carroll needed in order to obtain the return of his money.[43]

---

[40] Trial Record: Testimony of Carroll, Nov. 7, 2011 at 1:39 p.m. Caddell testified, however, that Carroll informed him that Farooqi was not entitled to a refund because the "time frame had passed." Trial Record: Testimony of Caddell, Nov. 7, 2011 at 3:20 p.m. Farooqi testified that Carroll first told him that he could not receive a refund because his 30 days were up. Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:56–57 a.m.

[41] Trial Record: Testimony of Carroll, Nov. 8, 2011 at 12:51–53 p.m. and 2:40 p.m.

[42] Id. at 2:41–42 p.m. While negotiating for the purchase of the Las Colinas Salad Bowl, Farooqi visited the Las Colinas Salad Bowl with a friend from New York who made the trip to Dallas with him, Ali Choudhry. Farooqi and Choudhry sat in the parking lot at the Las Colinas Salad Bowl to watch customer traffic in and around the location before the Option Agreement was signed. Ultimately, at Farooqi's request, Carroll agreed to employ Choudhry at the Las Colinas Salad Bowl so that Choudhry could monitor the restaurant's operations and report back to Farooqi about those operations. Based in part on Choudhry's reports, Farooqi remained interested in purchasing the Las Colinas Salad Bowl for the many months that Farooqi attempted to move forward with the purchase. Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 10:11–12 a.m.

[43] Trial Record: Testimony of Farooqi, Nov. 8, 2011 at 2:47 p.m.

---

By March 2010, Farooqi had been unemployed for almost two months and was faced with an ever-growing number of unpaid bills. In order to obtain money to pay his various bills and expenses, Farooqi took out a $15,000 personal loan from BBVA Compass Bank.[44] Farooqi was introduced to the loan officers at BBVA by Carroll, who had a personal relationship with the bank manager.[45] However, Farooqi testified that the loan obtained from BBVA was solely for his personal expenses and was not intended to fund the purchase of another Salad Bowl Café.[46] Carroll did not co-sign the loan or provide any personal or corporate information to BBVA in support of the loan.[47]

After almost a year of asking Carroll for a refund without receiving one, Farooqi filed a lawsuit in state court.[48] Once Carroll filed for protection under the Bankruptcy Code, Farooqi filed the Adversary.

### D. Witness Credibility

While Farooqi is naïve and relatively unsophisticated in business matters, he was a credible witness at trial. While there were some inconsistencies in his testimony, those inconsistencies were not material to the outcome of this dispute and are explained by the passage of time and fading memories. Moreover, much of Farooqi's testimony on key issues was

---

[44] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:59 a.m.

[45] *Id.* at 9:59–10:00 a.m.

[46] *Id.*

[47] *Id.* at 10:00 a.m.

[48] The Legal Clinic at Southern Methodist University School of Law represented Farooqi in the state court action. No copy of the state court complaint was introduced at trial. Carroll testified that he was unaware of any lawsuit filed by Farooqi in state court. After being shown a letter sent to his bankruptcy counsel referencing the suit, and a record issued on January 13, 2011, which referenced the state court suit, Carroll admitted that his statement that he was unaware of Farooqi's state court action was untrue. Trial Record: Testimony of Carroll, Nov. 8, 2011 at 12:24–34 p.m. Because no documents related to the state court action were admitted, this Court is unaware of the exact claims raised in that action or the disposition of that suit.

corroborated by the testimony of other credible witnesses who were subpoenaed by Farooqi to testify at trial, including Marshall and Caddell.[49]

In contrast, Carroll was not a credible witness. He (i) was often evasive in answering questions, (ii) sweated profusely while on the witness stand, and (iii) generally seemed quite uncomfortable as a witness. Carroll's testimony was often inconsistent with the overwhelming weight of the evidence and was frequently directly contradicted by the testimony of every other witness at trial. And, as noted previously, certain of Carroll's testimony changed during the course of the trial. When called as an adverse witness on the first day of trial, Carroll testified that he didn't return Farooqi's money because he needed to first discuss the refund with counsel for the Salad Bowl Entities.[50] Then, the next day, Carroll testified in response to his counsel's questions that he would have returned Farooqi's money if Farooqi had just come to the Salad

---

[49] Carroll's counsel made much of the fact that Marshall couldn't tick off a detailed listing of all of the financial information Carroll had failed to provide to her at trial. Trial Record: Testimony of Marshall, Nov. 7, 2011 at 5:01 p.m. While that's true, the Court is satisfied that information was requested of Carroll that he failed to provide. What that information was is not particularly relevant to this dispute. Moreover, as Marshall noted, she was subpoenaed to testify at trial and had not reviewed her records from several years ago in any detail in order to prepare for her testimony. *Id.* at 4:51 p.m.

Carroll's counsel also attacked Caddell's credibility as a witness due to the "falling out" Carroll and Caddell had when Caddell left the employ of the Salad Bowl Entities. Trial Record: Closing Argument of Carroll's Counsel, Nov. 8, 2011 at 3:29−30 p.m. Caddell testified that he and Carroll had been good friends (in fact he had been in Carroll's wedding party), but that he left the employ of the Salad Bowl Entities because Carroll refused to pay Caddell's attorney fees incurred during the Hinshaw Lawsuit, after promising to do so. Trial Record: Testimony of Caddell, Nov. 7, 2011 at 3:23−24 p.m. Notwithstanding this attack and the fact that the Court may not like Caddell's business ethics much either (as he sat in the room with Farooqi while Carroll made false misrepresentations to Farooqi that Caddell knew were false and said nothing after Caddell had been sued by the Hinshaws for alleged false misrepresentations), the Court found Caddell's trial testimony to be credible. He was relaxed on the witness stand, made eye contact with the Court when answering questions and seemed forthcoming even about events that implicated his own possible misconduct.

[50] Trial Record: Testimony of Carroll, Nov. 7, 2011 at 1:39 p.m. Caddell testified, however, that Carroll informed him that Farooqi was not entitled to a refund because the "time frame had passed." Trial Record: Testimony of Caddell, Nov. 7, 2011 at 3:20 p.m. Farooqi testified that Carroll first told him that he could not receive a refund because his 30 days were up. Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:56−57 a.m.

Bowl Entities' offices to sign certain non-compete and non-disclosure documents, which Farooqi testified he was never told he needed to do.[51]

With regard to this specific testimony, the Court believes Farooqi, not Carroll.  Farooqi was never told that he could get his money back by signing non-compete and non-disclosure documents.  It is clear to the Court that if he had been so told, he would have signed them in order to get his $25,000 back.  Based on the credible evidence at trial, Carroll told Farooqi that Farooqi couldn't get his money back because it was too late, the Option Agreement had expired.  With regard to other conflicting testimony between Carroll and Farooqi, the Court generally finds Farooqi's testimony credible and the testimony of Carroll not credible.

## II.      LEGAL ANALYSIS

Farooqi seeks a monetary judgment against Carroll for fraudulent inducement, fraud,[52] and violations of the Texas Deceptive Trade Practice Act ("DTPA"). Farooqi seeks damages for his economic losses and mental anguish, as well as exemplary damages for fraudulent inducement and treble damages as allowed by the DTPA.  Finally, Farooqi seeks a determination that any damages awarded are nondischargeable in Carroll's bankruptcy case under section 523(a)(2)(A) of the Bankruptcy Code.

---

[51] Trial Record: Testimony of Farooqi, Nov. 8, 2011 at 2:47 p.m.  Caddell testified about the financial difficulties facing the Salad Bowl Entities at some length.  Trial Record: Testimony of Caddell, Nov. 7, 2011 at 2:50–53 p.m.   In particular, the Salad Bowl Entities still owed Grosse his franchise fee and the Hinshaw Lawsuit settled in the late spring or early summer of 2010 for a sizeable sum.  Trial Record: Testimony of Carroll, Nov. 8, 2011 at 12:10 p.m. and 12:47–49 p.m.

[52] The Court will not analyze Farooqi's fraud claim in any detail because even if Farooqi prevails on this claim, it is dischargeable in Carroll's bankruptcy case due to Farooqi's failure to ask that it be excepted from Carroll's discharge under the correct subsection of the Bankruptcy Code.  Farooqi sought to have his fraud claim liquidated and declared nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.  However, the proper claim of nondischargeability lies under section 523(a)(2)(B), as will be briefly explained below. *See infra* pp. 52–55.  Farooqi's fraud claim relates to Carroll's failure to disclose the Hinshaw Lawsuit in the Financial Disclosure Document provided to Farooqi on September 25, 2009.  The Financial Disclosure Document is a written statement respecting the financial condition of the Salad Bowl Entities, who are insiders of Carroll.  Accordingly, any debt obtained by use of the Financial Disclosure Document would not be excepted from Carroll's discharge under section 523(a)(2)(A), but would be excepted under section 523(a)(2)(B).  Farooqi failed to plead such a claim; and thus, any fraud judgment obtained by Farooqi here would be dischargeable in Carroll's bankruptcy case.

From the Court's perspective, the Court must first consider whether Farooqi is entitled to a judgment against either or both of the Salad Bowl Entities on his claims of fraudulent inducement and/or violations of the DTPA.  There is little doubt from the evidence that Carroll was dealing with Farooqi as an officer of one or both of the Salad Bowl Entities, not in his individual capacity.  Second, if Farooqi is entitled to a judgment against one or both of the Salad Bowl Entities, the Court must consider whether Carroll can be held personally liable for that judgment.  Finally, if Carroll can be held personally liable, the Court must consider whether that debt is dischargeable in Carroll's bankruptcy case.

However, before reaching these questions, the Court must consider a threshold issue relating to this Court's authority to hear and finally determine Farooqi's claims against Carroll, to which we now turn.

### A.  Can this Court Hear and Finally Determine the Claims in the Adversary?

Carroll has questioned this Court's "subject matter jurisdiction" over the Adversary as a result of the Supreme Court's recent decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  From this Court's perspective, *Stern* does not implicate the grant of subject matter jurisdiction over bankruptcy cases and proceedings arising in the bankruptcy case, under the Bankruptcy Code (like the Adversary) or related to the bankruptcy case under 28 U.S.C. § 1334.  That subject matter jurisdiction is, and has been since 1984, vested in the United States District Court for the Northern District of Texas under 28 U.S.C. § 1334.  Then, under 28 U.S.C. § 151,  Congress granted bankruptcy courts the power to "exercise" certain "authority conferred" upon the district courts by title 28, but bankruptcy courts were not granted their own independent subject matter jurisdiction over bankruptcy cases and proceedings.  Congress also provided further procedures in 28 U.S.C. § 157 pursuant to which the district court may refer bankruptcy cases and

proceedings to the bankruptcy courts for either final determination or proposed findings and conclusions. So, as relevant here, this Court exercises authority with respect to Carroll's underlying chapter 13 bankruptcy case and the Adversary pursuant to a standing order of reference adopted in this District on August 3, 1984.

From this Court's perspective, *Stern* simply clarified bankruptcy courts' constitutional power, not their subject matter jurisdiction. The Court in *Stern* discussed this critical distinction at length, 131 S. Ct. at 2606-08, and expressly clarified that 28 U.S.C. § 157 is not jurisdictional. *Id*. at 2607. ("Section 157 allocates the authority to enter final judgment between the bankruptcy court and the district court. That allocation does not implicate questions of subject matter jurisdiction."). So, while Carroll has couched his arguments as an attack on the subject matter jurisdiction of this Court, that argument is premised upon an inaccurate reading of *Stern*. The district court clearly has subject matter jurisdiction over the Adversary. Nothing in *Stern* has changed that or challenged the propriety of that; rather, *Stern* specifically addresses the Constitutional authority of this Court, as an Article I tribunal, to hear and finally determine a debtor's common-law counterclaim to a proof of claim filed against the bankruptcy estate. Further discussion of *Stern* will be helpful to put the decision in its proper context.

In *Stern,* the Supreme Court held that a bankruptcy court, as an Article I tribunal, may not constitutionally enter a final judgment over a debtor's counterclaim that would not necessarily be resolved by the resolution of the debtor's objection to the claimant's proof of claim. *Id*. at 2618. According to the Supreme Court, although "public rights" disputes may be decided by non-Article III tribunals, public rights disputes must involve rights "integrally related to a particular federal government action." *Id*. at 2613. The debtor's counterclaim in *Stern* did not constitute a "public rights" dispute. *Id*. at 2614. Thus, according to the Supreme Court, entering a final

judgment with respect to the debtor's counterclaim, which would not have been decided by the allowance of the claimant's proof of claim, would be an impermissible exercise of the judicial power of the United States by a non-Article III tribunal. *Id.* at 2615. This was so notwithstanding the fact that (i) the relevant statute — 28 U.S.C. § 157(b)(1) — expressly authorized the bankruptcy judge to "hear and determine . . . all core proceedings . . . arising in a case under title 11," that were referred to it by the district court under 28 U.S.C. § 157(a), and (ii) "counterclaims by the estate against persons filing claims against the estate" are expressly defined to be a "core proceeding." 28 U.S.C. § 157(b)(2)(C). While Chief Justice Roberts stated in his majority opinion that the *Stern* holding was quite narrow and would have a limited practical impact,[53] many lower courts and commentators are struggling to understand its broader implications, if any. *See, e.g.*, Jonathan Azoff and Thomas Szaniawski, *Stern v. Marshall and the Limits of Consent*, 30 AM. BANKR. L. J. 28 (2011); Ralph Brubaker, *Article III's Bleak House (Part II): The Constitutional Limits of Bankruptcy Judges' Core Jurisdiction*, 31 No. 9 BANKR. L. LETTER 1 (2011); *In re Extended Stay, Inc.*, No. 09-13764-JMP, 2011 WL 5532258 (S.D.N.Y. Nov. 10, 2011); *In re Davis*, No. 05-15794-GWE, 2011 WL 5429095 (Bankr. W.D. Tenn. Oct. 5, 2011); *In re Teleservices Group, Inc.*, 456 B.R. 318 (Bankr. W.D. Mich. 2011).

With this background in mind, the Court will address Carroll's arguments about its lack of "subject matter jurisdiction" or, as properly framed by this Court, its alleged Constitutional inability to hear and finally determine the claims asserted in the Adversary. The focal point of

---

[53] Specifically, in response to arguments that the decision would "create significant delays and impose additional costs on the bankruptcy process," the Chief Justice wrote that the Court did not believe that "removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one." 131 S.Ct. at 2619–20. The opinion went on to explain why it was important to adhere strictly to Article III's requirements even if the decision in this case "does not change all that much." *Id.* at 2620. And the concluding paragraph of the opinion stated the "one isolated respect" in which the Court concluded that the Bankruptcy Act of 1984 exceeded the limitations of Article III — *i.e.*, "[t]he bankruptcy court below lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.*

Carroll's argument is on Farooqi's failure to file a proof of claim in Carroll's underlying chapter 13 bankruptcy case before the bar date for the filing of such claims. According to Carroll, that failure to file a proof of claim somehow divests this Court of its "subject matter jurisdiction." There are several problems with this argument.

First, as just discussed, *Stern* is not a subject matter jurisdiction case. If anything, Carroll should be questioning this Court's Constitutional authority to hear and finally determine the state law claims asserted in the Adversary.

Second, while Farooqi did not file a formal proof of claim in Carroll's bankruptcy case prior to the bar date, he did file the Adversary in which he seeks to both liquidate his claim and hold Carroll responsible for that claim. Under clear Fifth Circuit precedent, Farooqi's filing of the Adversary constitutes an informal proof of claim, which gives him the right to participate in distributions from Carroll's bankruptcy estate. In *Nikoloutsos v. Nikoloutsos (In re Nikoloutsos)*, 199 F.3d 233 (5th Cir. 2000), the court adopted a 5-part test to determine what qualifies as an informal proof of claim, following the decisions of several sister circuits. Specifically, the Fifth Circuit stated that "to qualify as an informal proof of claim: (1) the claim must be in writing; (2) the writing must contain a demand by the creditor on the debtor's estate; (3) the writing must evidence an intent to hold the debtor liable for such debt; (4) the writing must be filed with the bankruptcy court; and (5) based upon the facts of the case, allowance of the claim must be equitable under the circumstances." *Id*. at 236. Each of these elements is established here. The Adversary complaint is in writing; it contains a demand by Farooqi on Carroll and his estate; it evidences an intent to hold Carroll liable for Farooqi's debt; it was filed with this Court prior to the expiration of the bar date; and, as explained in the balance of this Memorandum Opinion, allowance of Farooqi's claim is equitable under the circumstances. While the allowance of

Farooqi's claim could have diluted distributions to Carroll's other unsecured creditors, Carroll's confirmed chapter 13 plan does not propose any distributions to unsecured creditors. Moreover, even if other unsecured creditors were diluted by the allowance of Farooqi's claim, Farooqi is entitled to his share of the estate while Carroll's bankruptcy case is pending and, if Farooqi is successful here in having his debt excepted from Carroll's discharge, Farooqi will be entitled to pursue Carroll following the conclusion of the bankruptcy case in order to collect any unpaid balance. Accordingly, the Court finds that Farooqi timely filed an informal proof of claim in Carroll's bankruptcy case and, to the extent that Farooqi's alleged failure to file a proof of claim is somehow an impediment to this Court's authority to hear and finally determine the Adversary, the Court concludes that Carroll's objection is without merit.

Finally, *Stern* does not implicate this Court's authority to hear and finally determine whether a creditor's claim is excepted from a debtor's discharge by 11 U.S.C. § 523(a)(2), even if the Court is required to first liquidate the creditor's claim in that process. In analyzing this argument and the claims at issue in the Adversary, the Court notes that there are two distinct issues. First, is a debt owed to Farooqi based upon the state law claims he asserts against Carroll for fraudulent inducement and DTPA violations? Second, if a debt is owed, is that debt excepted from Carroll's discharge under 11 U.S.C. § 523(a)(2)(A)?

Taking the second issue first, there can be little doubt that this Court, as an Article I tribunal, has the Constitutional authority to hear and finally determine what claims are non-dischargeable in a bankruptcy case. Determining the scope of the debtor's discharge is a fundamental part of the bankruptcy process. As noted by the court in *Sanders v. Muhs (In re Muhs)*, 2011 WL 3421546 (Bankr. S.D. Tex Aug. 2, 2011), "[t]he Bankruptcy Code is a public scheme for restructuring debtor-creditor relations, necessarily including the 'exercise of exclusive

jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts.'" *Id*. at *1 (citing *Central Va. Cmty. College v. Katz*, 546 U.S. 356, 363–64 (2006)). Congress clearly envisioned that bankruptcy courts would hear and determine all core proceedings, 28 U.S.C. § 157(b)(1), which include, as relevant here, "determinations as to the dischargeability of particular debts." 28 U.S.C. § 157(b)(2)(I). The Supreme Court has never held that bankruptcy courts are without Constitutional authority to hear and finally determine whether a debt is dischargeable in bankruptcy. In fact, the Supreme Court's decision in *Stern* clearly implied that bankruptcy courts have such authority when it concluded that bankruptcy courts had the Constitutional authority to decide even state law counterclaims to filed proofs of claim if the counterclaim would necessarily be decided through the claims allowance process. *Stern*, 131 S. Ct. at 2618.

So, the question becomes, does the analysis of Constitutional authority change if the bankruptcy court must first liquidate the claim? For the reasons explained below, this Court concludes it does not.

First, under *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 593 (1985), a right closely integrated into a public regulatory scheme may be resolved by a non-Article III tribunal. This is the so-called "public rights exception" discussed by the Supreme Court in *Stern*. There is no question that liquidating Farooqi's state law claims against Carroll is "closely integrated" into the Bankruptcy Code. Farooqi needs an allowed claim in order to participate in distributions from Carroll's bankruptcy estate. Moreover, Farooqi needs an allowed claim in order for this Court to determine if that claim is dischargeable in Carroll's chapter 13 bankruptcy case.

Second, the Fifth Circuit has already determined that this Court has the authority to enter a judgment on an unliquidated claim when determining the dischargeability of that debt in a bankruptcy case. In *In re Morrison*, 555 F.3d 473, 378–79 (5th Cir. 2009), the Fifth Circuit held that a bankruptcy court has the authority to liquidate a state law claim and enter a monetary judgment against a debtor when deciding if that claim/judgment is non-dischargeable in a debtor's bankruptcy case. In deciding this question, the Fifth Circuit followed several other circuit courts that had concluded that bankruptcy courts had the power to enter a judgment in exactly this manner. *See, e.g.*, *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017–18 (9th Cir. 1997); *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965–66 (6th Cir. 1993); *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir. 1993); *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1508 (7th Cir. 1991). As the court in *Christian v. Kim (In re Kim)*, 2011 WL 2708985 at *2 (Bankr. W.D.Tex. July 11, 2011) noted: "[t]he defendant overreads [*Stern*] and its application to this proceeding. Even if the defendant were right, however, the court would be compelled to follow existing Fifth Circuit precedent as set out in *Morrison* . . . as this court cannot ignore (much less 'overrule') existing binding circuit precedent, even if that precedent is thought to be inconsistent with a later decision by the Supreme Court. Only the circuit itself can overrule its own precedents." Like the *Kim* court, until the Fifth Circuit overrules *Morrison*, this Court will rely upon *Morrison* for its authority to liquidate Farooqi's state law claims against Carroll and enter a judgment on such claims.

Finally, at least one other court has come to the same conclusion – *i.e.*, that *Stern* does not hold, directly or indirectly, that an Article I tribunal is without the Constitutional authority to liquidate a creditor's claim against a debtor through entry of a final dollar judgment and then determine whether that judgment is dischargeable in the debtor's bankruptcy case. *See, e.g.,*

*Dragistic v. Boricich (In re Boricich)*, 2011 WL 5579062 at *1 (Bankr. N.D.Ill. Nov. 15, 2011) ("*Stern* left intact the authority of a bankruptcy judge to fully adjudge a creditor's claim. In this case, the claim was an adversary proceeding against debtor to bar dischargeability of a debt due to Plaintiff. Therefore, the authority to enter a final dollar judgment as part of the adjudication of nondischargeability, as recognized in *Hallahan*,[54] was not impaired by *Stern*.").

For all of these reasons, this Court concludes that it has the Constitutional authority to (i) liquidate Farooqi's state law claims against Carroll through the entry of a money judgment following trial, and (ii) determine whether that judgment is nondischargeable in Carroll's chapter 13 bankruptcy case.

### B. Was Farooqi Fraudulently Induced into Entering Into the Option Agreement?

Before turning to a discussion of the merits of Farooqi's fraudulent inducement claim against Carroll,[55] the Court must address a threshold issue raised by Carroll's counsel regarding whether Farooqi pled this claim with sufficient specificity in order to take it to trial. Carroll's counsel argued vigorously that Farooqi had not adequately pled this claim such that a trial of it was appropriate. Moreover, Carroll's counsel made it clear that the claim was not being tried by consent.

### 1. Did Farooqi Adequately Plead His Fraudulent Inducement Claim?

Carroll's counsel argued that because Farooqi's claims are based on fraud, they must meet the heightened pleading standard under FED. R. CIV. P. 9(b). There is no question that FED.

---

[54] Like the Fifth Circuit held in *Morrison*, the Seventh Circuit held in *Hallahan* that a bankruptcy court could enter a final dollar judgment against a debtor as part of a nondischargeability action.

[55] While Carroll was the "actor," as noted previously, he was acting as an officer of Inc. when negotiating with Farooqi with respect to the Option Agreement.

R. CIV. P. 9(b) requires particularity when pleading fraud or mistake. *See Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1954 (2009). Courts have held that mere conclusory allegations of fraud are insufficient to meet the heightened standard of FED. R. CIV. P. 9(b). *See generally Keith v. Stoelting, Inc.*, 915 F.2d 996 (5th Cir. 1990); *Tucker v. Nat'l Linen Serv. Corp.*, 200 F.2d 858 (5th Cir. 1953).

In *Keith*, the Fifth Circuit noted that "at a minimum, [particularity] requires that the plaintiff allege the time, place and contents of the alleged misrepresentation, as well as the identity of the person making them." *Keith*, 915 F.2d at 999. In *In re Compaq Securities Litigation*, 848 F. Supp. 1307, 1310 (S.D. Tex. 1993), the court stated that "[s]ince Rule 9(b) is to be read in conjunction with Rule 8's general notice pleading requirement that pleadings contain a 'short and plain statement of the claim,' it can be satisfied as long as the complaint contains information concerning the 'time, place, and nature of fraudulent behavior and defendant's relationship thereto.'" Similarly, the Seventh Circuit has held that "Rule 9(b) does not require that the complaint explain the plaintiff's theory of the case, but only that it state the misrepresentation, omission, or other action or inaction that plaintiff claims was fraudulent." *Midwest Commerce Banking v. Elkhart City Centre*, 4 F.3d 521, 523 (7th Cir. 1993) (citation omitted).

Here, the Court is satisfied that Farooqi's complaint sets forth specific misrepresentations that allegedly were made, and gives enough of a narrow time frame (the dates surrounding the negotiations of the Option Agreement) for Carroll to be aware of what Farooqi was complaining about. While Farooqi's complaint (in either the original or amended versions) is not artfully drafted,[56] paragraphs 20 and 21 of the Second Amended Complaint state that "Defendant

---

[56] The Court notes that Farooqi is represented here by the Legal Clinic at Southern Methodist University School of Law. While the clinic students are supervised by a licensed attorney, it is clear that much of the work is actually

obtained funds from Plaintiff by false pretenses, false representations, or actual fraud. Defendant is liable to Plaintiff for fraudulent inducement of the option to purchase contract." Moreover, in paragraph 26 of the Second Amended Complaint, admittedly during a discussion of Farooqi's DTPA claims, Farooqi alleges the following facts: "Defendant represented that the 'Option Out' in the Option Agreement was a rescission provision. Defendant did so to induce Plaintiff to sign the Option Agreement and pay the $25,000 'consideration.' Defendant has failed to return Plaintiff's option payment." From this Court's perspective, a reading of the Second Amended Complaint in its entirety adequately articulates the basis for Farooqi's fraudulent inducement claim, as well as the facts necessary to support that claim.

Further, it is well established in the Fifth Circuit that a Joint Pre-Trial Order signed by the Court supersedes the pleadings in the case, in terms of determining the issues before the Court at the time of trial. *Mid-Continent Casualty Co. v. Eland Energy, Inc.*, 2011 WL 2417158 at \*38 (N.D. Tex. June 14, 2011) (citing *E.E.O.C. v. Serv. Temps, Inc.*, 2010 WL 5108733 at \*3 (N.D. Tex. Dec. 9, 2010), ("[t]he joint pretrial order supersedes all pleadings and governs the issues and evidence to be presented at trial.")[57] The *Mid-Continent* court further noted that "a party has presented an issue in the trial court if that party has raised it in either the pleadings or the pretrial order, or if the parties have tried the issue by consent." *Id.* at \*38 (citing *Portis v. First Nat'l Bank of New Albany*, 34 F.3d 325, 331 (5th Cir. 1994)).

---

student work product. Nevertheless, the complaint must be tested as vigorously as if Farooqi was paying his lawyers for their time, instead of being represented pro bono.

[57] *See also*, *Maxam, Ltd v. Lane*, 51 Fed. App'x 929, 2002 WL 31415291 at \*3 (5th Cir. 2002) ("A party can preserve an issue by making the argument in its pleadings, identifying it in the joint pretrial order, or trying it by consent."); *Branch-Hines v. Herbert*, 939 F.2d 1311, 1319 (5th Cir. 1991) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial. . ."); *Flannery v. Carroll*, 676 F.2d 126, 129 (5th Cir. 1982) ("The claims, issues, and evidence are limited by the [pretrial] order and the course of the trial is thereby narrowed to expedite the proceeding."); *Krisher v. Xerox Corp.*, 102 F. Supp. 2d 715, 718 (N.D. Tex. 1999) ("It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial.") (Citing *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996)).

---

Here, the Joint Pre-Trial Order was signed by both parties and entered by the Court on October 26, 2011, almost two weeks before the trial commenced. Docket #36. The parties had ample time to finalize their trial preparation based on the facts and claims contained therein. Listed under contested issues of fact in the Joint Pre-Trial Order were the following:

> (20) Whether Carroll made false representations to Farooqi that he would provide full and prompt franchise disclosures. (21) Whether Carroll made false representations to Farooqi that the option out provision of the Option Agreement was not limited to 30 days. (22) Whether Carroll made representations with the fraudulent intention to induce Farooqi into signing the Option Agreement and paying $25,000 to Carroll and the Salad Bowl Franchise Corp.

*Id*. The Joint Pre-Trial Order also listed dates and time frames when the purchase of a franchise was discussed, when documents were sent to Farooqi, the nature of the alleged misrepresentations, and that Carroll made the misrepresentations. If the Second Amended Complaint was at all deficient, any deficiency was cured in the Joint Pre-Trial Order.

While Carroll did object in the Joint Pre-Trial Order to any statement of facts that he deemed to be outside of the pleadings, Joint Pre-Trial Order, p. 2, the Court concludes that when the pleadings are considered along with the Joint Pre-Trial Order, Carroll was sufficiently on notice of the fraudulent inducement claim Farooqi intended to pursue against him at trial. In *Thrift v. Hubbard*, 44 F.3d 348 (5th Cir. 1995), Thrift argued that the Hubbards, who were both defendants and cross-plaintiffs, should not have been entitled to a recovery at trial on several of their causes of action because those causes of action were not pled. The Fifth Circuit noted that, as is true here, there could be no implication of consent based on the numerous objections made by Thrift, including an objection in the pre-trial order to the pleadings, which were perceived by Thrift to be defective. The Fifth Circuit noted that because the claim was raised in the pre-trial order, "even if objected to, Thrift cannot, and indeed did not, argue that admission of evidence

on this issue caused any surprise." *Thrift*, 44 F.3d at 356 n.12. The Fifth Circuit also observed that a party's pleadings need not specify in detail every possible theory of recovery but need only plead sufficiently to give the defendant fair notice of the claim and the facts upon which it rests. *Id*. at 356. Finally, in determining that the trial court had not abused its discretion in determining that both claims were sufficiently pled, the Fifth Circuit stated that "while it is arguable whether the pleadings adequately distinguished between two causes of action, the pretrial order clearly identified both 'business' and 'contractual' relationships." *Id.* at 357.

For these reasons, the Court concludes that Farooqi's fraudulent inducement claim against Carroll was sufficiently pled to give Carroll fair notice of this claim and the facts upon which it rests.

### 2. Has Farooqi Established the Elements of a Fraudulent Inducement Claim?

A fraudulent inducement claim arises when a party is induced to enter into an agreement through fraud or misrepresentation. A claim for fraudulent inducement shares the same elements as a simple fraud claim, *Amouri v. Southwest Toyota, Inc.*, 20 S.W.3d 165, 168 (Tex. App. — Texarkana 2000); *DeSentis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990), which are: (1) that a material misrepresentation was made that was false; (2) that was either known to be false when made or was asserted without knowledge of its truth; (3) that was intended to be acted on; (4) that was relied on; and (5) that caused injury. *Amouri*, 20 S.W.3d at 168–69; *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998).

### a. Two Material Misrepresentations Were Made

A misrepresentation is a false statement of fact or a promise of some future performance made with the intent not to perform. *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 723

(Tex. 1990); *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). To be a "material" misrepresentation, the statement must have induced Farooqi to enter into a transaction that he would not have entered into but for the representations. *See, e.g.*, *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P.*, 335 S.W.3d 297, 305 (Tex. App. — Houston [14[th] Dist.] 2010); *Am. Med. Int'l v. Giurintano*, 821 S.W.2d 331, 338 (Tex. App. — Houston [14[th] Dist.] 1991).

Here, the alleged misrepresentations are (i) Carroll's statements about his willingness to provide full and prompt disclosure of all information necessary for Farooqi to obtain financing for his purchase of the Las Colinas Salad Bowl, and (ii) Carroll's statements that the Opt-Out Provision of the Option Agreement was not limited in time to the 30-days otherwise provided for in the Option Agreement. Based on the credible evidence presented at trial, the Court concludes that each of these statements was a misrepresentation and each of these misrepresentations was material.[58]

Farooqi, Caddell and Marshall all testified that Carroll repeatedly represented to Farooqi that Inc. would provide any and all information necessary for Farooqi to obtain financing for his purchase of the Las Colinas Salad Bowl. Inc., acting through Carroll, did not provide the requested information. In fact, no documents were produced until the last day of the option period and what was produced on that date was a document Farooqi had been given before the Option Agreement was ever signed — *i.e.*, the Financial Disclosure Document. There is no question based upon the evidence introduced at trial that Farooqi would not have signed the Option Agreement without this material misrepresentation by Carroll.

Farooqi and Caddell also testified that Carroll repeatedly represented to Farooqi that the Opt-Out Provision of the Option Agreement was not limited to 30 days. Rather, according to

---

[58] Hereinafter, the Court will refer to these two statements collectively as the "Misrepresentations."

Farooqi and Caddell, Carroll assured Farooqi repeatedly that Farooqi could opt-out of the Option

Agreement at any time if either of two conditions was not satisfied: (i) that Inc. failed to provide

information requested by Farooqi, or (ii) that Farooqi's loan application was denied. The record

is clear that Farooqi was very concerned about the 30-day time period otherwise provided for in

the Option Agreement. In particular, Farooqi was concerned that his loan application could not

be approved within a 30-day time frame.[59] In fact, Marshall testified that 30 days was an

extremely short period of time in which to obtain approval of a commercial loan. Farooqi and

Caddell also testified that Carroll told Farooqi repeatedly not to worry about the 30-day period

otherwise provided in the Option Agreement because the Opt-Out Provision would be unlimited

in duration and would allow Farooqi to receive a refund at any time if one of the above

conditions was satisfied.[60] Given Farooqi's stated concerns about the length of the option period

and Marshall's view that a commercial loan could not be approved in 30 days, the Court is

satisfied that Farooqi would not have signed the Option Agreement without this material

misrepresentation by Carroll.

Accordingly, the first element of a fraudulent inducement claim has been proven with

respect to the Misrepresentations.

### b.  The Misrepresentations Were Known to be False When Made

With respect to the Misrepresentations, the Court finds, based on its review of the credible

evidence, that Carroll made the Misrepresentations with knowledge of their falsity. First, Carroll

knew at the time he made the representation about producing needed information that he would

---

[59] Trial Record, Testimony of Farooqi, Nov. 7, 2011 at 9:44 a.m; Testimony of Caddell, Nov. 7, 2011 at 3:19–20 p.m.; Testimony of Marshall, Nov. 7, 2011 at 4:10 p.m., 4:13–14 p.m. and 5:18 p.m.

[60] Trial Record, Testimony of Farooqi, Nov. 7, 2011 at 9:44 a.m; Testimony of Caddell, Nov. 7, 2011 at 3:19–20 p.m.; Testimony of Marshall, Nov. 7, 2011 at 4:10 p.m., 4:13–14 p.m. and 5:18 p.m.

not do so. As the testimony at trial established, Marshall began requesting information immediately. Despite repeated continuing assurances by Carroll that he would produce the requested information, not a single new document was produced during the 30-day option period. While Carroll's failure to provide the requested information, by itself, is insufficient evidence of his intent not to perform, that failure is a fact that can be considered with other circumstantial evidence to establish intent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986).

Here, Caddell testified that the Salad Bowl Entities were having financial difficulties. Caddell testified that he was managing cash on a daily basis — reducing food orders at certain locations and negotiating with vendors to keep supplies in the restaurants.[61] Based on this largely unrefuted testimony, it is clear that the Salad Bowl Entities needed cash to continue their operations. Farooqi was expressing doubts about signing the Option Agreement, which meant that no funds would be forthcoming. It appears that Carroll said what he needed to say to get Farooqi to sign the Option Agreement irrespective of the truth of his statements. In short, from the Court's perspective, Carroll lured Farooqi in with the promise of returning his $25,000 at any time if Farooqi didn't get the documents he needed or his financing wasn't approved. Carroll got what he wanted and needed — Farooqi's money. Whether Farooqi got what he wanted — *i.e.*, the Las Colinas Salad Bowl — wasn't a particular concern of Carroll's.

Moreover, the Court finds, based upon its review of the credible evidence, that Carroll knew that he wouldn't return Farooqi's money even if one or both of the conditions was satisfied. Once again, the fact that this representation by Carroll was false when it was made is evidenced, at least in part, by Carroll's subsequent conduct. Based upon the circumstances

---

[61] Trial Record, Testimony of Caddell, Nov. 7, 2011 at 2:50–53 p.m. and 2:58–59 p.m.

found above, the Court finds that Carroll acted with fraudulent intent.  Farooqi testified that he would not have signed the Option Agreement prior to his financing being approved without repeated assurances from Carroll that (i) Farooqi would be provided with any and all information required to complete his loan application, and (ii) Farooqi could opt out of the Option Agreement at any time and receive a return of his money if his financing wasn't approved.  Instead, when Farooqi asked for a return of his $25,000 after his loan application was denied by New England Commercial, Carroll initially told Farooqi that it was too late to request a return of those funds because the Option Agreement had expired.

Further evidence of Carroll's fraudulent intent was shown by Carroll's past dealings with other prospective franchisees.  For example, Caddell testified that Carroll attempted to sell a Salad Bowl Café in Roanoke, Texas to Joe Leszko ("Leszko") in the spring of 2009.  According to Caddell, Leszko paid Carroll $12,000 for the option to purchase that Salad Bowl Café.  When Leszko was unable to obtain his financing, Carroll repeatedly promised that he would return Leszko's money.  However, Carroll never returned the $12,000.[62]  Moreover, about that same time, Carroll attempted to sell the Las Colinas Salad Bowl to Tim Grosse ("Grosse").  Grosse paid $25,000 for a 30-day option to purchase.  Grosse too was unable to obtain financing and timely sent an option cancellation letter to Carroll.  Despite numerous promises by Carroll to return the $25,000 to Grosse, Carroll finally returned Grosse's money in July 2010 — over a year later — and only after Grosse hired a lawyer to represent him in connection with the

---

[62] Carroll testified that he never told Leszko that he would return the funds and that Leszko never asked for a return of his funds.  Trial Record: Testimony of Carroll, Nov. 7, 2011 at 12:10–12:11 p.m. and 2:17–18 p.m. However, according to Caddell, Leszko asked for his money back on multiple occasions, Carroll promised to return the money and Carroll never returned the money. According to Caddell, Carroll stated that Leszko needed to sign a variety of paperwork in order to obtain a refund and Leszko never provided said documents.  Trial Record: Testimony of Caddell, Nov. 7, 2011 at 3:05–07 p.m.

dispute.[63] The Court is persuaded that Carroll had a pattern and habit of making false promises to potential franchisees about his willingness to return their monies if they couldn't obtain financing to proceed with their purchases.

Accordingly, the second element of a fraudulent inducement claim has been proven with respect to the Misrepresentations.

### c. The Misrepresentation were intended to be relied upon

With respect to each of the statements discussed above, the Court finds that Carroll made the Misrepresentations with the intent that Farooqi rely upon them, so as to induce Farooqi to sign the Option Agreement and pay Inc. a $25,000 franchise fee. As noted previously, Farooqi was concerned about his ability to obtain final loan approval within the 30-day time period provided by the initial draft of the Option Agreement. In an effort to convince Farooqi to go ahead and sign the Option Agreement, Carroll represented that he would cooperate fully in Farooqi's efforts to obtain financing by providing the information Farooqi needed to get his loan approved and, when Farooqi continued to express concerns over the 30-day time period provided in the Option Agreement, Carroll added the Opt-Out Provision, which he assured Farooqi would allow Farooqi to get a refund of his monies at any time if (i) Carroll (acting on behalf of Inc.) failed to provide requested information, or (ii) Farooqi's loan application was denied. On this record, there is no question that Carroll intended that Farooqi rely upon the Misrepresentations.

### d. Farooqi relied upon the Misrepresentations

---

[63] Caddell testified that Carroll also misrepresented to Leszko, Grosse and Farooqi that their funds would be held in an escrow account during the option period so that the funds could easily be returned to them if necessary. Trial Record: Testimony of Caddell, Nov. 7, 2011 at 2:54−56 p.m., 3:06−08 p.m. and 3:09−11 p.m. However, according to Caddell, neither Salad Bowl Entity had an escrow account. Rather, Caddell testified that the funds were immediately deposited into a business operating account and spent, due to significant cash flow problems being experienced by the Salad Bowl Entities at that time. Trial Record: Testimony of Caddell, Nov. 7, 2011 at 2:54−56 p.m.

---

To prevail here, Farooqi must show that he actually relied on the Misrepresentations and that he was justified in doing so. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Based upon the credible evidence at trial, the Court finds that Farooqi actually relied on the Misrepresentations.

As noted previously, Farooqi is not particularly well educated or sophisticated. In fact, he comes across as a very nice, but naïve, individual. Farooqi had never negotiated to purchase a business before and he relied heavily on others to assist him. For example, Farooqi wanted Marshall to come to his meetings with Carroll because he viewed her as his "financial advisor," when she was really just a loan broker.[64] It is clear that Farooqi liked and trusted Carroll, who, from the Court's perspective, took advantage of Farooqi's lack of experience and sophistication.[65]

For Farooqi's reliance to be justified, he is not required to show that he acted reasonably in relying on the Misrepresentations. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003). However, Farooqi cannot recover if he blindly relied on misrepresentations that would have been obviously false given a cursory investigation. *Id.* But, "it is only where, under the circumstances, the facts should be apparent to one of [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Field v. Mans*, 516 U.S. 59, 71 (1995) (citation omitted).

---

[64] When she was asked if she was Farooqi's "financial advisor" by Carroll's counsel, Marshall appeared surprised and taken aback. She quickly clarified that she was simply his loan broker. Trial Record: Testimony of Marshall, Nov. 7, 2011 at 5:02 p.m.

[65] After everything that has happened to him as a result of Carroll's conduct, when Carroll's attorney asked Farooqi on cross examination if Farooqi believed that Carroll was "basically a good guy," Farooqi responded "yes." Trial Record: Testimony of Farooqi, Nov. 8, 2011 at 2:46 p.m. Although Carroll's counsel presumably intended that this question show the Court that Carroll was, in fact, a good guy, it simply reconfirmed the Court's impression that Farooqi was a trusting and incredibly naïve person.

Here, as just noted, Farooqi was an unsophisticated and naïve purchaser, with no meaningful and/or relevant business experience. There is no evidence to suggest that Farooqi should have known that he was being misled by Carroll. Thus, even though Farooqi took the Misrepresentations at face value, Farooqi's reliance on the Misrepresentations was justified given his lack of knowledge and experience and his general lack of sophistication. Moreover, given Carroll's and Caddell's failure to disclose the Hinshaw Lawsuit prior to the signing of the Option Agreement, there were no "red flags" readily apparent that required Farooqi to make a further investigation.

Accordingly, the Court finds that Farooqi was justified in his reliance on the Misrepresentations.

### e. The Misrepresentations caused injury

The credible evidence at trial clearly established that Farooqi would never have signed the Option Agreement if he had known that the Misrepresentations were false. Moreover, that evidence clearly established that Farooqi was injured as a result of his reliance on the Misrepresentations.

Farooqi seeks to recover the following alleged damages: (i) $25,000 for the franchise fee; (ii) $4,500 for the loan processing fee with New England Commercial; (iii) $17,500 for lost wages between February and June, 2010; (iv) $6,114 in moving expenses; (v) $25,000 for mental anguish; and (vi) $200,000 in punitive damages under § 41.008 of the Texas Civil Practice and Remedies Code. The goal of direct measures of damages is to make the plaintiff whole. *Henry S. Miller Co. v. Bynum*, 836 S.W.2d 160, 162 (Tex. 1992). In order to recover actual or compensatory damages, Farooqi must prove that he suffered an actual loss due to Carroll's wrongful conduct. *R.G. McClung Cotton Co. v. Cotton Concentration Co.*, 479 S.W.2d 733, 737

(Tex. Civ. App. Dallas 1972).  Farooqi must show the extent of any injury he sustained and the amount of the damage sustained.  *Eberley v. First Nat'l Bank of Stanton*, 272 S.W.2d 532, 538 (Tex. Civ. App. 1954).  Or, as stated by the Texas Supreme Court in *Arthur Anderson & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 816 (Tex. 1997), "[d]irect damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong.  Direct damages compensate the plaintiff for the loss that is conclusively presumed to have been foreseen by the defendant from his wrongful act."  When measuring direct or actual damages, the issue is not what Farooqi would have gained had Carroll's representations been true, but what Farooqi lost by being deceived.  *George v. Hesse*, 93 S.W. 107, 107–08 (Tex. 1906).

The *Perry Equipment* court went on explain consequential damages: "[c]onsequential damages, on the other hand, result naturally, but not necessarily from the defendant's wrongful acts.  Under the common law, consequential damages need not be the usual result of the wrong, but must be foreseeable,[66] and must be directly traceable to the wrongful act and result from it….  If damages are too remote, too uncertain, or purely conjectural, they cannot be recovered."  945 S.W.2d at 816.  *See also Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998) ("Consequential damages are those damages that 'result naturally, but not necessarily, from the defendant's wrongful acts.'  They are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach. Thus, to be recoverable,

---

[66] Included in Topic 1, Chapter 16 of the Restatement 2nd of Torts is Title B: "Rules Which Determine the Responsibility of a Negligent Actor for Harm Which His Conduct is a Substantial Factor in Producing." This Title explains foreseeability as follows: "(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable. (2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinarily that it should have brought about the harm." RESTATEMENT (SECOND) OF TORTS: FORESEEABILITY OF HARM OR MANNER OF ITS OCCURRENCE § 435 (1965).

consequential damages must be foreseeable and directly traceable to the wrongful act and result from it."); *Airborne Freight Corp., Inc. v. C.R. Lee Enters, Inc.*, 847 S.W.2d 289, 295 (Tex. 1993) ("[T]he plaintiff is entitled to recover 'special' or 'consequential' damages shown to be the proximate result of the misrepresentation. Consequential damages, unlike general damages, are not presumed to be the necessary and usual result of the wrong. Plaintiff must therefore plead and prove them separately, and they must be premised upon a finding that they proximately resulted from the wrongful conduct of the defendant."); *Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 271 (Tex. App. — Corpus Christi 2006) (citing *Formosa Plastics*, 960 S.W.2d at 49 and holding that consequential damages that are foreseeable and directly traceable to the fraud, and which result from the fraud, are recoverable).

Finally, in F*ormosa Plastics Corp. v. Presidio Engineers and Contractors*, 960 S.W.2d 41, 47 (Tex. 1998), the Texas Supreme Court held that fraudulent inducement claims, even those related to contracts, sounded in tort and were eligible for exemplary damages even if the damages sustained by the plaintiff were purely economic.

With these legal principals firmly in mind, the Court finds that Farooqi was damaged by his reliance on the Misrepresentations. However, not all of Farooqi's requested damages are recoverable here as will be explained below.

Farooqi's direct damages are limited to (i) the $25,000 Farooqi paid to Inc. under the Option Agreement, and (ii) the $4,500 Farooqi paid to New England Commercial as a loan application fee. These damages "flow naturally and necessarily from the wrong" in that Farooqi would not have signed the Option Agreement or applied for a loan for his purchase of the Las Colinas Salad Bowl had Carroll not made the Misrepresentations. These are the amounts Farooqi lost by being deceived by Carroll.

Certain other damages sought by Farooqi are consequential damages — *i.e.*, (i) the $17,500 of lost wages between February and June, 2010, and (ii) the $6,114 in moving expenses. The Court concludes that these damages are not recoverable because they were not foreseeable or directly traceable to Carroll's wrongful acts. The wrongful acts here are the Misrepresentations, which related only to Farooqi's ability to opt-out of the Option Agreement and get his $25,000 back. The Misrepresentations did not guarantee Farooqi that he would be successful in purchasing the Las Colinas Salad Bowl. Farooqi's decision to quit his job in New York City and move to Texas when he did were decisions he made independent of his reliance on the Misrepresentations, which only assured him that he could get his $25,000 back if, among other things, his loan application was not approved. In other words, Carroll should not be charged with decisions Farooqi made unrelated to the Misrepresentations; it wasn't reasonable to expect Farooqi to quit his job and move to Texas when he had not even been approved for a loan and his purchase of the Las Colinas Salad Bowl was far from certain. Or, in the words of the Restatement, looking back from Farooqi's alleged damages to Carroll's wrongful conduct, it appears to this Court "highly extraordinary that [the Misrepresentations] should have brought about the harm." RESTATEMENT (SECOND) OF TORTS: FORESEEABILITY OF HARM OR MANNER OF ITS OCCURRENCE § 435 (1965).

Farooqi also seeks to recover damages of $25,000 for his mental anguish. In order to recover mental anguish damages in Texas, a plaintiff is required to show proof of feeling depressed, confused, frightened, angry or scared or show changes in physical appearance and demeanor. *Higginbotham v. Allwaste, Inc.*, 889 S.W.2d 411, 417 (Tex. App. — Houston [14th Dist.] 1994). In *Phar-Mor, Inc. v. Chavira*, 853 S.W.2d 710, 712 (Tex. App. — Houston [1st Dist.] 1993), the court held that "[m]ental anguish is defined as intense pain of body or mind or a

high degree of mental suffering. Mental anguish is something more than mere worry, anxiety, vexation or anger. It is more than disappointment, resentment or embarrassment."

Here, Farooqi testified that he was embarrassed as a result of his loan being denied because he was forced to go on food stamps.[67] No other evidence of mental anguish was presented, such as inability to work, insomnia, physical manifestations of pain or stress or visits to a doctor. Because mere embarrassment is not a sufficient basis for a recovery of mental anguish damages, the Court concludes that Farooqi has not met his burden with regard to his alleged mental anguish damages.

Finally, Farooqi seeks to recover exemplary damages under section 41.008 of the TEX. CIV. PRAC. & REM. CODE. That section provides a formula limiting the amount of exemplary damages that may be awarded and provides:

> (b) Exemplary damages awarded against a defendant may not exceed an amount equal to the greater of:
> (1)(A) two times the amount of economic damages; plus
> (B) an amount equal to any noneconomic damages . . . not to exceed $750,000; or
> (2) $200,000.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.008 (West 2009). Farooqi seeks damages of $200,000 under this section.

In turn, section 41.003 sets forth the standard for recovering exemplary damages and provides, in relevant part, that: "(a) . . . exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud. . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West 2003). Finally, "[i]n determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating to: (1) the nature of the wrong; (2) the

---

[67] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:59 a.m. Farooqi also testified that he was "disheartened." *Id.*

character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant. TEX. CIV. PRAC. & REM. CODE ANN. § 41.011(a) (West 2008).

Based upon its review of the credible evidence, the Court finds that Farooqi has satisfied the statutory requirements necessary for an award of exemplary damages. He has proven, by clear and convincing evidence, that the harm for which he seeks a recovery of exemplary damages resulted from Carroll's fraud. Thus, Farooqi is entitled to an award of exemplary damages. The only remaining question is the amount of exemplary damages the Court should award.

Here, the "wrong" is Carroll's fraudulent inducement of Farooqi's execution of the Option Agreement by making the Misrepresentations (and Carroll's taking of Farooqi's $25,000 knowing that he would not return the funds to Farooqi even if the conditions to the return were satisfied). In making the Misrepresentations, Carroll took advantage of someone he knew to be naïve and unsophisticated and who he knew trusted him. Carroll was completely culpable and there was no credible evidence presented at trial that mitigated his conduct. Carroll's conduct offends a public sense of justice and propriety. However, Carroll has filed for relief under chapter 13 of the Bankruptcy Code and has a modest net worth based upon the information contained in his bankruptcy schedules. Moreover, according to Carroll, the Salad Bowl Entities are now defunct,[68] which is corroborated by the value that he placed on his shares of Inc. in his

---

[68] Trial Record: Testimony of Carroll, Nov. 8, 2011 at 12:12–13 p.m. Carroll testified that the Salad Bowl Entities filed for relief under chapter 7 of the Bankruptcy Code in the spring of 2011.

schedules.[69] This last factor mitigates against the Court awarding the maximum in punitive damages. After carefully considering each of these factors, the Court will award Farooqi exemplary damages of two times the amount of his economic damages ($29,500) or $59,000.

For all of these reasons, the Court concludes that Farooqi has proven his fraudulent inducement claim against Inc., the entity on whose behalf Carroll was acting when he negotiated the Option Agreement, and has proven his entitlement to a recovery of $88,500 on this claim, comprised of Farooqi's economic damages of $29,500 and exemplary damages of $59,000.

### C. Is Farooqi entitled to a judgment for violations of the DTPA?

Farooqi also alleges that Carroll violated the DTPA,[70] specifically sections 17.46(b)(12) and 17.46(b)(24). Proving a violation of the DTPA requires a plaintiff to meet a three-part test. First, the plaintiff must be a consumer. Second, the defendant must have committed, among other things, a "laundry-list" violation under section 17.46(b) on which the plaintiff detrimentally relied. Third, the wrongful act must be a producing cause of the plaintiff's economic or mental anguish damages. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995); *Wall v. Parkway Chevrolet, Inc.*, 176 S.W.3d 98, 105 (Tex. App. — Houston [1st Dist.] 2004). Farooqi also seeks treble damages for any sums awarded as a result of the DTPA violations as

---

[69] In his bankruptcy schedules, Carroll lists the total value of his stock and interests in the Salad Bowl Entities at $500. Carroll lists the value of his partnership agreement in the Salad Bowl Entities at $0. The total value of the assets listed by Carroll in his schedules amounts to $373,920.85 as compared to $359,740.24 in liabilities. *In re Michael Carroll*, Case No. 11-31005-bjh13, Docket # 16.

[70] As noted previously, while Carroll was the "actor," he was acting on behalf of Inc. when negotiating the Option Agreement.

provided for in TEX. BUS. & COM. CODE ANN. § 17.50 (West 2005).[71]   The Court will analyze

these issues in turn.

### 1.   Is Farooqi a consumer as that term is defined under the DTPA?

Under Texas law it is clear that "only a consumer has standing to maintain a private cause

of action. . . ."  *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 706 (Tex. 1983).  *See*

*also Knight v. Int'l Harvester Credit Corp.*, 627 S.W.2d 382, 388 (Tex. 1982); *Cameron v.*

*Terrell & Garret, Inc.*, 618 S.W.2d 535, 538 (Tex. 1981); *Riverside Nat'l Bank v. Lewis*, 603

S.W.2d 169, 173 (Tex. 1980). The DTPA excludes wholly intangible property rights because

intangibles do not qualify as goods or services. "The statutory definition of 'goods' indicates an

obvious legislative intent to exclude the purchase of intangibles from the scope of the DTPA."

*Hand v. Dean Witter Reynolds, Inc.*, 889 S.W.2d 483, 497 (Tex. App. — Houston [14th Dist.]

1994, writ denied); *Moody Nat'l Bank v. Texas City Development Ltd.*, 46 S.W.3d 373, 379–80

(Tex. App. — Houston [1st Dist.] 2001); *Lukasik v. San Antonio Blue Haven Pools*, 21 S.W.3d

394, 402–03 (Tex. App. — San Antonio 2000, no. pet.).

The DTPA itself defines "consumer" as "an individual . . . who seeks or acquires by

purchase or lease, any goods or services . . . ."  TEX. BUS. & COM. CODE ANN. §17.45(4) (West

2007).  Accordingly, in order to be a "consumer," Farooqi must have been seeking to purchase or

lease a good or service.  In turn, the DTPA defines a "good" as "tangible chattels or real property

---

[71] Section 17.50 of the TEX. BUS. & COM. CODE is the specific provision that allows a consumer to maintain an
action under the DTPA. Section 17.50 provides as follows:
    (a)   A consumer may maintain an action where any of the following constitute a
          producing cause of economic damages or damages for mental anguish:
          (1)   The use or employment by any person of a false, misleading, or deceptive act or
              practice that is:
              (A)  Specifically enumerated in a subdivision of Subsection (b) of Section 17.46
                  of this subchapter; and
              (B)  Relied on by a consumer to the consumer's detriment
Section 17.50 goes on to define the damages measure available to consumers for violations of the DTPA.

purchased or leased for use," while a "service" is defined as "work, labor, or service purchased or leased for use, including services furnished in connection with the sale or repair of goods." TEX. BUS. & COM. CODE ANN. §§ 17.45 (1) and (2) (West 2007).

Thus, to determine if Farooqi was a "consumer," this Court must determine what, exactly, Farooqi was seeking to acquire. If Farooqi's central objective in his transaction with the Salad Bowl Entities and Carroll was the acquisition of goods or services, then Farooqi will be a "consumer," thereby satisfying the first statutory element. *Flenniken*, 661 S.W.2d at 705. If, however, Farooqi's central objective was merely the exchange of intangibles without seeking a good or service, then Farooqi would not qualify as a "consumer," and no claim under the DTPA would lie. *Riverside Nat'l Bank*, 603 S.W.2d 169 at 175.

Texas courts have held that the objective of any transaction must be examined from the perspective of the plaintiff. *Flenniken*, 661 S.W.2d at 707; *see also Knight*, 627 S.W.3d at 389 ("Knight's objective in the transaction was the purchase of a dump truck. The financing arranged with IHCC was merely the means of making that purchase. . . . [T]here was a single transaction — the sale of a truck on an installment basis"); *Martin v. Lou Poliquin Enters., Inc.*, 696 S.W.2d 180, 184 (Tex. App. — Houston [14th Dist.] 1985) (citing *La Sara Grain Co. v. First Nat'l Bank of Mercedes*, 673 S.W.2d 558, 567 (Tex. 1984)) ("The Texas Supreme Court recently indicated that a person's 'objective' is of paramount importance in determining DTPA consumer status"). Further, it is not Farooqi's contractual relationship with Carroll that is determinative, but rather Farooqi's relationship to the transaction at issue. "A plaintiff establishes his standing as a consumer in terms of his relationship to the transaction, not by a contractual relationship with the defendant. The only requirement is that the goods or services sought or acquired by the consumer form the basis of his complaint." *Flenniken*, 661 S.W.2d at 707; *see also Cameron v.*

*Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex. 1981) ("Consumer is defined in section 17.45(4) only in terms of a person's relationship to a transaction in goods or services. It does not purport to define a consumer in terms of a person's relationship to the party he is suing").

Carroll argues that Farooqi is not a "consumer" under the DTPA because in the complained-of transaction Farooqi merely sought to acquire an option to purchase the Las Colinas Salad Bowl. In Carroll's mind, the Option Agreement, not the purchase of the Las Colinas Salad Bowl itself, was the transaction. And, according to Carroll, an option to purchase is considered an intangible in Texas because it merely grants a right and is not a good or service under the DTPA. *Hand*, 889 S.W.2d at 497–98. Therefore, according to Carroll, if the transaction at issue involved the purchase of an option and not the purchase of a franchise (or some other good or service), Farooqi is not a "consumer" under the DTPA.

Conversely, however, if Farooqi was seeking to acquire, among other things, a Salad Bowl franchise in his transaction with the Salad Bowl Entities and Carroll, he would be a "consumer" under the DTPA. *Texas Cookie Co v. Hendricks & Peralta*, 747 S.W.2d 873, 876 –77 (Tex. App. — Corpus Christi 1988, writ denied). As the court in *Wheeler v. Box*, 671 S.W.2d 75, 78–79 (Tex. App. — Dallas 1984, writ ref'd n.r.e.) held, "[a]lthough the [franchise] itself was an intangible, it encompassed both tangible personal property and services purchased for use in the function of the business. Indeed, we would have to adopt a very narrow and strained interpretation to conclude that the Boxes purchased neither tangible goods nor services."

Based upon its review of the credible evidence, the Court finds that Farooqi's objective from the outset of his relationship with the Salad Bowl Entities and Carroll was to acquire a Salad Bowl franchise; specifically, the Las Colinas Salad Bowl. Farooqi's objective was not to acquire just an option to purchase.

Moreover, important differences can be drawn between *Hand*, the primary case relied upon by Carroll, and this case. The contract at issue in *Hand* was an option contract for oil futures. The purchaser of the oil futures was seeking the right involved with a commodities option contract; that is, the right to buy something in the future at a set price. Generally speaking, the goal of options contracts is not to acquire the underlying good, but rather to acquire the right to purchase that good. It is the right, or option itself, that is valuable whether or not the purchaser actually wanted the oil. Here, however, Farooqi was not seeking the *right* to buy a franchise; he was interested in purchasing an *actual* franchise. A right to purchase a franchise does not carry the same inherent value as a right to purchase oil or other commodities at a set price. It seems disingenuous to suggest otherwise.

Finally, there is a line of cases in Texas, including the *Flenniken* case, which has held that where a plaintiff enters into an intangible contract with the end goal of acquiring a good or service, that plaintiff can be considered a consumer under the DTPA even though the contract was for an intangible. Texas courts have held that when a plaintiff has claims arising from a transaction where the ultimate objective of the transaction is the purchase of a good or service, a claim concerning the transaction also concerns the good or service for the purposes of the DTPA. *See, e.g.*, *Texas Cookie*, 747 S.W.2d at 876–77 (finding that when eligible services were clearly an objective of a transaction that otherwise involved the acquisition of an intangible, the transaction at issue was covered under the DTPA). In the *Flenniken* case, the plaintiffs entered into a contract with a bank and exchanged intangibles. The bank accepted a note and an assignment of a mechanic's lien in return for financing the acquisition of a home. The Texas Supreme Court held that the plaintiffs were consumers under the DTPA because "from the Flennikens' perspective, there was only one transaction: the purchase of a house. The financing

scheme Easterwood arranged with the bank was merely his means of making a sale . . . the Flennikens did not seek to borrow money; they sought to acquire a house. The house thus forms the basis of their complaint." *Flenniken*, 661 S.W.2d at 707–08. In *Knight v. International Harvester Credit Corp.*, the Texas Supreme Court overturned an appellate decision determining that the plaintiff was not a consumer because the sole basis for the complaint was the extension of credit for the purchase of a vehicle. *Knight*, 627 S.W.2d at 388. The *Knight* court held that the transaction needed to be viewed more broadly as a number of separate violations connected with the sale of a truck, which was clearly a good, even if each individual transaction may not have directly involved the good. The plaintiff had complained of a provision in the retail assignment contract that allegedly violated the DTPA. The *Knight* court held that the plaintiff had asserted a proper claim under the DTPA because the violations were connected with the sale of a good. *Id.* at 388–89.

Similar to the plaintiffs in *Flenniken*, Farooqi's ultimate objective in entering into the Option Agreement was the purchase of goods and services — *i.e.*, the Las Colinas Salad Bowl, which included a franchise, a real property lease, equipment, and services from one or both of the Salad Bowl Entities as franchisor. Similar to the plaintiff in *Knight*, Farooqi's DTPA claims arose from a document signed while entering into a transaction connected to the sale or purchase of an eligible good or service. Farooqi testified that he understood the Option Agreement to mean only that Carroll would hold the Las Colinas Salad Bowl for him while he obtained a commercial loan to fund the remainder of the agreed upon purchase price. Farooqi and Carroll had negotiated a total purchase price for the Las Colinas Salad Bowl, and Farooqi frequently

referred to the $25,000 option payment as a franchise fee or a down payment.[72]  Farooqi did not understand the Option Agreement to limit his ability to purchase the Las Colinas Salad Bowl and Farooqi believed that he was still on the way to purchasing it long after the Option Agreement had expired.  Farooqi does not seem to have understood the Option Agreement to have been anything other than a step along the way to the achievement of his ultimate goal — *i.e.*, the purchase of the Las Colinas Salad Bowl.  Farooqi envisioned a multi-step process — *i.e.*, Farooqi would make a $25,000 payment during the Option Period, with Carroll providing the needed information about the franchise operation to assist Farooqi in obtaining his loan for the balance of the purchase price.  Then, once Farooqi obtained his loan, the parties would sign the final sale contract and consummate the purchase/sale transaction.  Thus, when considering the evidence to ascertain Farooqi's objective, it is clear that his objective was, and remained, throughout his dealings with the Salad Bowl Entities and Carroll, the purchase of the Las Colinas Salad Bowl.

For all of these reasons, the Court concludes that Farooqi was a consumer under the DTPA.

### 2.  Has a "laundry list" violation occurred?

#### a.  Tex. Bus. & Com. Code § 17.46(b)(12)

Section 17.46(a) of the DTPA provides that "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful and are subject to action by the consumer protection division . . . ."  Subsection (b) then goes on to define certain specific acts as "false, misleading, or deceptive" including "representing that an agreement

---

[72] Carroll also frequently referred to the $25,000 in the same way, indicating to the Court that both parties perceived the Option Agreement as a step along the way to Farooqi purchasing the Las Colinas Salad Bowl, assuming Farooqi's loan was approved.

confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." TEX. BUS. & COM. CODE ANN. § 17.46(b)(12) (West 2007).

While analyzing Farooqi's fraudulent inducement claim, the Court found that Carroll made the Misrepresentations, one of which was misrepresenting the duration of the Opt-Out Provision. Specifically, and as noted previously, Carroll repeatedly assured Farooqi that the Opt-Out Provision of the Option Agreement would permit Farooqi to receive a return of his $25,000 at any time, notwithstanding the 30-day limitation contained in the Option Agreement, if one of two conditions was satisfied: (i) Inc., acting through Carroll, did not provide requested information, or (ii) Farooqi's loan application was denied. *See supra* pp. 4–8. Texas courts have held that oral misrepresentations concerning the terms of a written contract are actionable under the DTPA. *See, e.g.*, *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671–72 (Tex. 1990).

The Court also found, in the context of analyzing Farooqi's fraudulent inducement claim, that Farooqi actually and justifiably relied on the Misrepresentations, one of which was misrepresenting the duration of the Opt-Out Provision, when he signed the Option Agreement. *See supra* pp. 31–33. Thus, detrimental reliance has also been established.

Accordingly, Farooqi has established a claim under §17.46(b)(12) of the DTPA.

### b. Tex. Bus. & Com. Code § 17.46(b)(24)

Section 17.46(b)(24) sets forth another of the specific acts defined as "false, misleading or deceptive;" specifically, "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Here, Farooqi complains of Carroll's failure to disclose the Hinshaw Lawsuit filed against Carroll, Caddell, and Mark Gangler by the Hinshaws

on September 9, 2009 in state district court in Travis County, Texas shortly before Farooqi began his negotiations over a possible purchase of the Las Colinas Salad Bowl.

In the Hinshaw Lawsuit, Carroll, Caddell and Gangler were sued for allegedly making fraudulent misrepresentations in connection with a Salad Bowl transaction. Specifically, the Hinshaws asked for, among other things, declaratory relief that any agreements made by them had been rescinded, are void and ordering a return of approximately $122,000 paid by the Hinshaws. Plaintiff's Exhibit 2. According to Farooqi, if he had known about the Hinshaw Lawsuit, he would not have done business with Carroll and the Salad Bowl Entities.[73] And, as noted previously, on September 25, 2009, Carroll provided Farooqi with a copy of the Franchise Disclosure Document dated June 5, 2009. That document specifically represented that there was "no litigation required to be disclosed." Defendant's Exhibit 2, p. 3. Of course, when that document was provided to Farooqi it was out of date, as the Hinshaw Lawsuit was pending and was not disclosed.

As a preliminary inquiry, this Court must determine whether Carroll had a duty to disclose the Hinshaw Lawsuit. When there is a duty to disclose information, silence is considered to be the equivalent of a false representation regarding the missing information. *Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App. — Dallas 2010). A duty to disclose exists (i) when one voluntarily discloses information, the whole truth must be disclosed; (ii) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (iii) when one makes a partial disclosure and that disclosure conveys a false impression. *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 384 (Tex. App.— Houston [1st Dist.] 2010).

---

[73] Trial Record: Testimony of Farooqi, Nov. 7, 2011 at 9:52–53 a.m.

Here, Carroll clearly had a duty to disclose the Hinshaw Lawsuit to Farooqi. In the Financial Disclosure Document Carroll represented that no litigation was pending, which therefore obligated him to disclose the entire truth about pending litigation once the Hinshaw Lawsuit was filed.

Based upon the credible evidence at trial, the Court concludes that Carroll failed to disclose the existence of the Hinshaw Lawsuit because he was concerned that if the Hinshaws' allegations were disclosed, it would cause Farooqi to walk away from any business dealings with him and the Salad Bowl Entities. In other words, the Court finds that Carroll failed to disclose the Hinshaw Lawsuit in order to induce Farooqi to (i) move forward with his intended purchase of the Las Colinas Salad Bowl, (ii) sign the Option Agreement, and (iii) pay the $25,000 franchise fee called for in the Option Agreement.

The Court is also satisfied that if Carroll had disclosed the Hinshaw Lawsuit, Farooqi would have refused to proceed forward with his attempt to purchase the Las Colinas Salad Bowl as he testified at trial.[74] Thus, detrimental reliance has also been established.

Accordingly, Farooqi has established a claim under §17.46(b)(24) of the DTPA.

### 3. Were the violations a producing cause of Farooqi's economic damages or mental anguish?

Within the meaning of the DTPA, a "producing cause" of an injury is an efficient, exciting or contributing cause that in the natural sequence of events produces injuries or damages. *Ibarra v. Nat'l Construction Rentals, Inc.*, 199 S.W.3d 32, 35 (Tex. App. — San Antonio 2006). "Producing cause requires that the act be both a cause in fact and a substantial factor in causing the plaintiff's injuries." *Id.*; *Brown v. Bank of Galveston, Nat. Ass'n*, 963 S.W.2d 511, 514 (Tex. 1998).

---

[74] *Id.*

Based upon the credible evidence at trial, the Court finds that Carroll's misrepresentation about the duration of the Opt-Out Provision was a producing cause of damage to Farooqi, in that this misrepresentation was both a cause in fact and a substantial factor in causing at least a portion of Farooqi's damages, as will be explained below. Moreover, the Court finds that Carroll's failure to disclose the Hinshaw Lawsuit was a producing cause of at least a portion of Farooqi's damages too.

### 4. What damages, if any, is Farooqi entitled to recover for the DTPA violations?

Farooqi seeks to recover the following alleged damages: (i) $25,000 for the franchise fee; (ii) $4,500 for the loan processing fee to New England Commercial; (iii) $17,500 for lost wages between February and June, 2010; (iv) $6,114 in moving expenses; (v) $25,000 for mental anguish; and (vi) $234,342 in multiple damages under the DTPA. The Court has already liquidated Farooqi's economic damages in connection with its analysis of Farooqi's fraudulent inducement claim and awarded him $29,500. *See supra* pp. 33–39. Those remain Farooqi's economic damages under the DTPA since under the DTPA, "economic damages" are defined as "compensatory damages for pecuniary loss, including costs of repair and replacement. The term does not include exemplary damages or damages for physical pain and mental anguish . . . ." TEX. BUS. & COM. CODE ANN. § 17.45(11) (West 2007). Moreover, Farooqi's consequential and mental anguish damages under the DTPA suffer from the same flaws discussed in connection with Farooqi's fraudulent inducement claim.[75] *See supra* pp. 36–37. That leaves only Farooqi's request for multiple damages under the DTPA.

---

[75] *See Serv. Corp. Int'l v. Aragon*, 268 S.W.3d 112, 119 (Tex. App. — Eastland 2008) (applying the same standard this Court used in determining mental anguish damages for Farooqi's fraudulent inducement claim in the context of a DTPA claim) ("Mental anguish requires more than mere worry, anxiety, vexation, embarrassment, or anger. Instead, a plaintiff must show a high degree of mental pain or distress").

Section 17.50(b) sets forth the measure of damages for claims under the DTPA, specifically claims under subsection (b) of §17.46. It provides:

> [i]n a suit filed under this section, each consumer who prevails may obtain: (1) the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages.

TEX. BUS. & COM. CODE ANN. §17.50(b)(1) (West 2005). The Texas Supreme Court has held that the maximum amount of damages for a knowing violation of the DTPA is three times the actual damages. *Jim Walter Homes, Inc. v. Valencia*, 690 S.W.2d 239 (Tex. 1985). "Knowingly" is defined in the DTPA as

> actual awareness, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the consumer's claim . . . but actual awareness may be inferred where objective manifestations indicate that a person acted with actual awareness.

TEX. BUS. & COM. CODE ANN. § 17.45(9) (West 2007). Moreover, the DTPA defines "intentionally" as

> actual awareness of the falsity, deception, or unfairness of the act or practice . . . coupled with the specific intent that the consumer act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness. Intention may be inferred from objective manifestations that indicate that the person acted intentionally or from facts showing that the defendant acted with flagrant disregard of prudent and fair business practices to the extent that the defendant should be treated as having acted intentionally.

TEX. BUS. & COM. CODE ANN. §17.45(13) (West 2007).

This Court has already found that Carroll, acting on behalf of Inc., made the Misrepresentations while aware of their falsity and with the intent that Farooqi act in detrimental reliance on them. *See supra* pp. 28–31. Moreover, the Court finds that Carroll failed to disclose the Hinshaw Lawsuit knowing that by failing to disclose it he was deceiving Farooqi with the intent that Farooqi rely upon his deception. Because Carroll acted intentionally, treble damages are available here. When Farooqi's economic damages of $29,500 are trebled under the DTPA, the total amount of his recoverable damages is $88,500.[76]

For all of these reasons, the Court concludes that Farooqi has proven his DTPA claim against Inc., the entity on whose behalf Carroll was acting when he negotiated the Option Agreement, and has proven his entitlement to a recovery of $88,500 on this claim, comprised of a trebling of Farooqi's economic damages of $29,500.

### D. Is Carroll personally liable for the Misrepresentations he made as an officer of Inc.?

Farooqi has not pled any claims based on alter ego or piercing the corporate veil. Therefore, in order for Farooqi to recover here, he must be able to hold Carroll personally liable for any of the Misrepresentations Carroll made as an officer of Inc. With respect to Farooqi's fraudulent inducement claim, the law of agency allows Farooqi to hold Carroll personally liable for his damages despite Farooqi's failure to plead any claims of alter ego or veil piercing. Under Texas law, "[a] corporation's agent is personally liable for his own fraudulent or tortuous acts, even when acting within the course and scope of his employment." *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App. — San Antonio 2008); *see Miller v. Keyser*, 90 S.W.3d 712, 717

---

[76] *See Jim Walter Homes*, 690 S.W.2d at 241–42 (holding that language in the DTPA limiting damages to "not more than three times the amount of economic damages" meant literally that. In other words, to calculate treble damages under the DTPA, courts should simply multiply the economic damages awarded by three, rather than multiplying the economic damages by three to calculate a punitive damages measure and then adding back in the economic damages, which would result in a quadrupling of the economic damages).

(Tex. 2002); *Ward Family Foundation v. Arnette (In re Arnette)*, 454 B.R. 663, 697 (Bankr. N.D. Tex. 2011) ("The law is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a representative of the corporation." (citing *Gore v. Scotland Golf, Inc.*, 136 S.W.3d 26, 32 (Tex. App. — San Antonio 2003)). When a plaintiff has brought an action seeking to hold an agent personally liable for his own fraudulent acts, no piercing of the corporate veil is required. *Sanchez*, 274 S.W.3d at 712.

With respect to Farooqi's DTPA claims, the result is the same. In *Miller v. Keyser*, 90 S.W.3d 712 (Tex. 2002), the Texas Supreme Court held that because the DTPA allows a consumer to bring suit against "any person," an agent for a disclosed principal may be held personally liable for the misrepresentations he makes when acting within the scope of his employment. The *Miller* court noted that "[i]n *Weitzel* we concluded that when corporate officers make affirmative misrepresentations in connection with the sale of a home, the agents are personally liable under the DTPA even though they were acting on behalf of the corporation. Liability attaches because the officers *themselves* made the misrepresentations," *id.* at 717 (emphasis in original), "[a]gents are personally liable for their own torts. There is no basis for concluding differently based on the claims brought under the DTPA. Accordingly, we hold that an agent may be held personally liable for his own violations of the DTPA." *Id.* at 718 (citations omitted).

For these reasons, Carroll is personally liable for the damages caused by the Misrepresentations as liquidated above. *See supra* at pp. 33–39 and 49–51.

### E. Is Farooqi entitled to a judgment of nondischargeability on his state law claims?

Farooqi bears the burden of proving, by a preponderance of the evidence, that the debts at issue are excepted from Carroll's discharge under section 523(a)(2)(A) of the Bankruptcy Code. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005). Section 523(a)(2) provides that "a discharge under section 727 . . . does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by: (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). As this Court noted in *In re Arnette*, 454 B.R. at 698, "[a]lthough the general purpose of the Bankruptcy Code is to provide debtors with a fresh start, 'section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud.'" (citations omitted).

In *In re Acosta*, the Fifth Circuit set forth a five-part test for determining nondischargeability under section 523(a)(2)(A). In order for a debt to be nondischargeable under that section, Farooqi must show that: (i) Carroll made a representation; (ii) Carroll knew the representation was false; (iii) Carroll made the representation with the intention to deceive Farooqi; (iv) Farooqi actually and justifiably relied on the representation; and (v) Farooqi sustained losses as a proximate result of his reliance. 406 F.3d at 372. *See also RecoverEdge, L.P. v Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995).

Here, Farooqi has established the elements of his fraudulent inducement claim. As this Court previously found: (i) Inc., acting through Carroll, made the Misrepresentations, which induced Farooqi to sign the Option Agreement; (ii) Carroll was aware the Misrepresentations were false when he made them; (iii) Inc., acting through Carroll, intended for Farooqi to rely on

the Misrepresentations; (iv) Farooqi actually relied on the Misrepresentations and was justified in relying on them; and (v) Farooqi was injured by his reliance and sustained losses as a proximate result of his reliance.  *See supra* pp. 26–39.  And, as the Court concluded previously, Carroll is personally liable for this fraud.  *See supra* pp. 51–52.

Accordingly, the elements of section 523(a)(2)(A) have been satisfied regarding Farooqi's fraudulent inducement claim.  The testimony at trial clearly established that Farooqi was damaged in the amount of $88,500 as a result of Carroll's fraud, which debt is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

Farooqi's section 17.46(b)(12) DTPA claim is based on the same conduct as the fraudulent inducement claim.   Inc., acting through Carroll, represented that the Opt-Out Provision in the Option Agreement conferred or involved rights, remedies, or obligations which it did not have or involve; specifically, that the Opt-Out Provision would allow Farooqi to receive a refund of his $25,000 if either of two conditions was satisfied.  Carroll intentionally or knowingly made the representation and Farooqi relied on that representation when signing the Option Agreement.  Farooqi was injured as a result of Carroll's representations about the rights conferred or involved.  *See supra* pp. 45–46.  And, as the Court concluded previously, Carroll is personally liable for this DTPA violation.  *See supra* pp. 51–52.

Accordingly, the elements of section 523(a)(2)(A) have been satisfied regarding this DTPA claim.  The testimony at trial clearly established that Farooqi was damaged in the amount of $88,500 as a result of Carroll's DTPA violation, which debt is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code. *See Cohen v. De La Cruz*, 523 U.S. 213, 223 (1998) ("'Any debt . . .  for money, property, services, or . . . credit, to the extent obtained by' fraud

encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages . . .").

In his section 17.46(b)(24) claim, Farooqi alleges that Carroll failed to disclose the Hinshaw Lawsuit.  While the Court has concluded that Farooqi proved his DTPA claim under §17.46(b)(24), Farooqi sought to have this claim declared nondischargeable under the wrong provision of the Bankruptcy Code.  As noted previously, the Franchise Disclosure Document and the statements contained therein are statements of the financial condition of an insider of Carroll and, as such, those damages would only be nondischargeable under section 523(a)(2)(B) of the Bankruptcy Code, which claim was not pled.  *See supra* n.52.  Accordingly, any damages owing to Farooqi for Carroll's violation of section 17.46(b)(24) are dischargeable in Carroll's chapter 13 bankruptcy case.

### III. CONCLUSION

Farooqi has proven the following claims against Inc.: (i) fraudulent inducement, with actual and exemplary damages of $88,500; and (ii) violation of §17.46(b)(12) and §17.46(b)(24) of the DTPA, with actual and exemplary damages of $88,500.  Farooqi has also proven that Carroll is personally liable for Farooqi's damages.  Because Texas law forbids double recovery,[77] Farooqi can only recover once for his $88,500 of damages.

Finally, Farooqi has proven that his now liquidated claim against Carroll for (i) fraudulent inducement, and (ii) Carroll's violation of section 17.46(b)(12) of the DTPA is nondischargeable under section 523(a)(2)(A) of the Bankruptcy Code.  However, Farooqi's claim that Carroll violated section 17.46(b)(24) of the DTPA is dischargeable in Carroll's

---

[77] *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) ("A party is generally entitled to sue and to seek damages on alternative theories . . . .  A party is not entitled to a double recovery . . ."); *Birchfield v. Texarkana Mem. Hosp.*, 747 S.W.2d 361, 367 (Tex. 1987); *Foley v. Parlier*, 68 S.W.3d 870, 882 (Tex. App. — Ft. Worth 2002, no pet.).

chapter 13 case due to Farooqi's failure to plead nondischarageability under the correct subsection of section 523(a)(2).

A judgment consistent with this Memorandum Opinion will be entered separately.

### ### End of Memorandum Opinion ###